IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

KEVIN DONDI CRAIG,

Defendant.

No. CR09-3013

REPORT AND RECOMMENDATION

TABLE OF CONTENTS

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.   PROCEDURAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.  ISSUE PRESENTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

IV.   RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
      A.    Initial Investigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
      B.    Warrantless Entry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
      C.    Subsequent Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

V.    DISCUSSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
      A.    Was the Warrantless Entry Supported by Exigent Circumstances? . . .  9
      B.    Is the Evidence Admissible Under the Independent
            Source Doctrine? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
            1.    Would the Officers Have Applied for a Search Warrant Had
                  They Not Acquired Additional Information in the Initial
                  Warrantless Entry? . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
            2.    Does the Application for the Search Warrant Support
                  Probable Cause After the Tainted Information is Removed?  .  16
      C.    Are Defendant's Statements Admissible Into Evidence? . . . . . . . . .  18
            1.    Statements Made at Defendant's Home . . . . . . . . . . . . . .  19
            2.    Statements Made at the Sheriff's Office  . . . . . . . . . . . . .  22

VI.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

VII.  RECOMMENDATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

## I. INTRODUCTION

On the 18th day of May, 2009, this matter came on for hearing on the Motion to Suppress (docket number 16) filed by the Defendant on May 8, 2009. The Government was represented by Assistant United States Attorney Rebecca Goodgame Ebinger. Defendant Kevin Dondi Craig appeared personally and was represented by his attorney, JoAnne M. Lilledahl.

## II. PROCEDURAL BACKGROUND

On April 7, 2009, Defendant Kevin Dondi Craig was charged by Indictment (docket number 2) with being a felon in possession of firearms and ammunition. At his initial appearance and arraignment on April 10, Defendant entered a plea of not guilty and trial was scheduled before Chief Judge Linda R. Reade on June 8, 2009.

On May 8, Defendant timely filed the instant motion to suppress. The motion was referred to the undersigned Magistrate Judge for a report and recommendation, and hearing was scheduled on May 18. Prior to the hearing, Defendant filed a notice of intent to enter a conditional guilty plea, reserving the right to withdraw his plea if the Court grants his motion to suppress. *See* docket numbers 24 and 27. On May 20, Defendant appeared before the undersigned Magistrate Judge and tendered a plea of guilty to the indictment. Chief Judge Linda R. Reade accepted Defendant's conditional plea on June 4, 2009. *See* docket number 34.

## III. ISSUE PRESENTED

On November 25, 2008, law enforcement officers conducted a warrantless entry into Defendant's home. The Government concedes that it did not have valid consent to enter the house. The Government argues, however, that (1) the warrantless entry into Defendant's home was justified due to exigent circumstances, and (2) evidence seized pursuant to a subsequent state court search warrant is admissible under the independent source doctrine.

## IV. RELEVANT FACTS

### A. Initial Investigation

At 10:24 p.m. on November 24, 2008, the Butler County Sheriff's Office received a 911 call regarding a woman carrying a baby and walking on Packard Avenue, a rural blacktop road. According to the caller, the woman was attempting to "flag down" a car. Uncertain of the circumstances and apparently afraid to stop, the motorist called 911 rather than stop at the scene. Deputy Sheriff Kiley Winterberg was dispatched to the scene. Winterberg was ten miles away, however, and therefore he asked the Greene, Iowa, chief of police to assist. Winterberg approached on Packard Avenue from the south and the Greene chief of police approached from the north.

Upon arriving at the scene, the officers were unable to locate the woman and baby described in the 911 call. The officers started to search the side roads, when the sheriff's office received another call from a resident in the area. The caller reported that the woman and her baby had appeared at the caller's door, requesting assistance. Both officers responded to that residence.

Deputy Winterberg testified that upon arrival he spoke with "CW," age 22, who was with her 18-month-old daughter.[1] CW, who was wearing blue jeans and a "light top," was crying and appeared "shaken up." According to Winterberg, however, when he was kneeling near CW he did not smell any alcohol. CW's daughter was wearing pajamas and was wrapped in a blanket.

In response to questioning by Deputy Winterberg, CW said that she had spent the evening with Defendant, who is her step-father. According to CW, three other individuals came to Defendant's house, were drinking, and eventually began arguing. Corey Sawvel testified that he arrived at the house at around 5:00 p.m., together with his brother and

---

[1] In a copy of the application for search warrant received as an exhibit at the instant hearing, the woman's name is "blacked out," except for her initials -- "CW." *See* Government's Exhibit 1 at 6. Accordingly, the Court will refer to the woman in this report as "CW."

nephew. The occupants of the house were drinking and Sawvel opined that Defendant was intoxicated. According to Sawvel, CW was also drinking from a "red bottle" and appeared intoxicated.

CW told Deputy Winterberg that at some point the Sawvel brothers began arguing and Defendant went into the bedroom and retrieved a handgun which belonged to CW's mother (Defendant's wife). Defendant came out of the bedroom and shot the gun "through the front door." Corey Sawvel confirmed at the instant hearing that he saw Defendant fire a handgun that evening. Shortly after that time, Sawvel left the home, together with his brother and nephew.

CW then went to her bedroom and went to bed, with her daughter in bed with her. CW told Deputy Winterberg that Defendant then came into her bedroom and was yelling and screaming. Defendant then left the bedroom, but came back, jumped in bed with CW, and was pulling her hair. When Defendant left the bedroom again, CW took her daughter and left the house.

CW told Deputy Winterberg that Defendant is a convicted felon. She also volunteered that Defendant had sexually abused her at age 12 and is a registered sex offender. CW lived in the house with Defendant and her mother. Her mother had left that morning, however, on a one-week trip to Florida. CW also told Winterberg that there were other guns in the house and she warned law enforcement to "be ready" when they went to the residence. Winterberg then gave CW and her daughter a ride to Greene, where they stayed with friends. At Winterberg's request, CW wrote out a statement describing the evening's events.[2]

---

[2] CW began writing the statement at 11:04 p.m. and completed the statement at 11:16 p.m. *See* attachment to Application for Search Warrant (Government's Exhibit 1 at 6).

## B. *Warrantless Entry*

Deputy Winterberg testified that he verified that Defendant has a prior felony conviction and then called Butler County Sheriff Jason Johnson to discuss how to proceed. According to Winterberg, Sheriff Johnson recalled that Defendant was a registered sex offender. They decided that Winterberg would go to Defendant's house, together with two other deputies and the Greene chief of police. The officers agreed that if no one answered the door, then Winterberg would seek a search warrant.

Some time after midnight, Deputy Winterberg and the three other officers went to Defendant's rural home. There was a light on in the kitchen area. Winterberg knocked on the back door and Corey Sawvel responded. At the instant hearing, Sawvel testified that after leaving Defendant's house initially, Defendant called him and said CW had left following an argument and he wanted to go looking for her. Sawvel told Defendant that he shouldn't drive because of his drinking, and Sawvel proceeded back to Defendant's house. Apparently, however, neither Defendant nor Sawvel ever went looking for CW.

When Sawvel responded to the back door, he was taken outside and placed in handcuffs. Sawvel told officers that he had been sleeping and, based on his appearance, Deputy Winterberg testified that "we believed him." The officers knew that Sawvel did not match Defendant's description. When asked whether Defendant was in the residence, Sawvel said that he thought Defendant had left with a female and was not home. Officers asked Sawvel if they could enter the residence to look for Defendant and, according to Winterberg, Sawvel "shrugged his shoulders and said 'do what you got to do.'" As the officers were entering the house, Sawvel told them that it was not his house.

Upon entering the house, the deputies announced themselves as "sheriff's office." Defendant responded from behind the closed bedroom door by asking "who the f____ is in my house?" Defendant came out of the bedroom at the officers' request, wearing only a blanket. Defendant was followed a short time later by a female companion, after officers gave her an opportunity to put on clothes.

In response to questioning, Defendant admitted that he is a convicted felon and admitted shooting a gun that evening. The officers then arrested Defendant and transported him to the sheriff's office.

While they were in Defendant's house, one of the deputies saw marijuana in plain view. Upon returning to the sheriff's office, Deputy Winterberg prepared an application for a search warrant. On his supporting affidavit, Winterberg described the events as follows:

> On November 24,2008 at about 10:24 p.m. I received a call of a female walking north on the Packard Blacktop carrying a baby. I located this female at 11908 Packard Ave. She told me that her step-dad was intoxicated and was arguing with his friends. At one point he grabbed her mothers [sic] pistol and fired it thru the front screen door. She had taken her daughter to bed with her and when his friends left he came into her bedroom yelling and she tried to ignore him. He came in again and climbed on top of her screaming. As she tried to push him away he was pulling her hair and laying on top of her.
>
> She told me that he had raped her when she was 12 and that he had spent time in jail for it. Her mother had just left and flew to Florida for the week. She told me that he was a sex offender and that he was a convicted felon. I ran a criminal history check on Kevin Dondi Craig and it did show him to be a felon. He is also a registered offender with Butler County. I went to this residece [sic] to make contact with this subject.
>
> At the residece [sic] II [sic] knocked on the door and made contact with Corey Sawvel. Mr. Sawvel told Deputy Bass and I that no one else was in the residence and that we could go ahead and look if we wanted to. Deputy Bass and I entered the residence and announced "Sheriffs Office" continually. As we entered the living room we noticed a casing, other bullets and drug paraphernalia (marijuana pipe) in this room and we heard [a] voice from behind a bedroom door that startled us asking what the f____ is goig [sic] on. We identified ourselves and ordered the subject out. This

> subject was identified as Kevin Craig and Cindy Johnson was also in this room. In the doorway I saw the bedroom full of long guns strewn about with more ammo lying around. I asked Mr. Craig if he had fired a gun that evening and he replied that he had; out the front door. I asked if it was the gun nearest the doorway and his reply was a shotgun I think the Mossberg, I have lots of them. He went on to say that he shoots out the front door all [the] time and that he did it just yesterday. I placed him under arrest for possession of a firearm as a felon and read him miranda [*sic*] which he understood. He was then transported to the Butler County Jail.

*See* Application for Search Warrant, Affidavit A at 1-2 (Government's Exhibit 1 at 3-4).

Also attached to the application was the statement of CW, which provides:

> Night went fine until stepdad got drunk and eventually shot my mother's pistol. I got scared and went to bed. I got my daughter out of bed and put her in bed with me. He kept coming in my room and yelling. I tried to ignore him but it wouldn't work. He then tried to climb on top of me with my baby right beside me. I kept trying to push him away and he grabbed my hair and started screaming. I got my daughter and ran to the nearest house that I could get to.
>
> My stepdad had also raped me when I was 12 and my mother wouldn't believe any of it. He eventually spent about 9 months in jail. He got out due to my sister testifying on his behalf.

*See* Application for Search Warrant, Voluntary Statement of CW (Government's Exhibit 1 at 6).

The application and attachments were submitted to Judicial Magistrate Ronald J. Pepples at approximately 3:00 a.m. Magistrate Pepples issued a search warrant at that time. The search warrant was executed and officers seized a number of "long guns," pistols, ammunition, "a little bit of marijuana," and a marijuana pipe.

### C. Subsequent Statement

Defendant was taken to court on the morning of November 25, 2008 and "bonded out." On the following day, November 26, Defendant came to the sheriff's office and asked to speak with Sheriff Johnson. The conversation was surreptitiously recorded by Johnson and a copy of the recording was introduced at the instant hearing as Government's Exhibit 2.

While Defendant was not in custody and had asked to come to the sheriff's office to speak with the sheriff, Sheriff Johnson nonetheless warned him that any statements could be used against him. Defendant then described the events of the evening of November 24. According to Defendant, Corey Sawvel and his brother, Kevin, came over to Defendant's house to watch TV and drink beer and whiskey. Corey and Kevin "got into it" and eventually became aggressive toward Defendant. When the Sawvels did not immediately leave when requested to do so, Defendant retrieved a "snub nose" and shot it out the screen door. The Sawvel brothers and their nephew then left the house.

Defendant told Sheriff Johnson that CW had gone to bed. Defendant apparently believed that since he was awake, CW should also be awake, and therefore he went to the bedroom to try to wake her up. CW began screaming and "the baby" also woke up. Defendant admitted that he "wrestled around with her." CW then took her daughter and "ran out the door."

According to Defendant, he then called a female friend and told her that CW had left and he needed her help. The female friend then drove over to Defendant's house. Corey Sawvel apparently returned to the house after that time.

In his instant motion, Defendant asks that the Court suppress "any evidence obtained as a result of the search of his home on November 25, 2008, including any statements obtained from him by law enforcement."

## V. DISCUSSION

The Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, protects persons "against unreasonable searches and seizures." The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (citing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)).

### A. Was the Warrantless Entry Supported by Exigent Circumstances?

Here, it is undisputed that the officers initially entered Defendant's home without a valid warrant. Accordingly, the entry is presumptively in violation of the Fourth Amendment. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). The Government has the burden of overcoming the presumption of unreasonableness that attaches to all warrantless home entries. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). The Government can meet this burden by establishing exigent circumstances which "make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). "The exigent circumstances exception to the warrant requirement is narrowly drawn." *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). A search under the exigent circumstances exception is reasonable if the circumstances, viewed objectively, justify it. *United States v. Valencia*, 499 F.3d 813, 815 (8th Cir. 2007). "The searching officers' subjective motivations are irrelevant." *Id.*

A warrantless entry by law enforcement officers may be legal "when there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). For example, "[e]xigent circumstances are present where lives are threatened, a suspect's escape is eminent, or evidence is about to be destroyed." *United States v. Williams*, 521 F.3d 902, 908 (8th Cir. 2008). *See also Brigham City*, 547

U.S. at 403 ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury."); *United States v. Santana*, 427 U.S. 38, 42-43 (1976) (permitting warrantless entry into a home while in "hot pursuit" of a fleeing suspect); and *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005) ("The risk that evidence will be destroyed during the time required to obtain a search warrant can be an exigent circumstance that justifies a warrantless entry.").

Here, the Government argues that exigent circumstances justify the officers' initial entry into Defendant's home because "[t]he officers were reasonably concerned for their safety and the safety of any other occupants of the Craig home when they arrived in the early morning hours of November 25, 2008."[3] "A legitimate concern for officer safety or the safety of others may constitute an exigent circumstance, and a warrantless entry into a residence may be justified if an officer has a reasonable fear of harm." *United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006). *See also United States v. Hill*, 430 F.3d 939, 941 (8th Cir. 2005) (same); *United States v. Janis*, 387 F.3d 682, 687 (8th Cir. 2004) ("We have long held the 'view that legitimate concern for the safety of individuals may constitute exigent circumstances justifying warrantless entries and searches.'").

The Government argues in this case that an objectively reasonable officer would have sufficient grounds to believe that a warrantless entry into Defendant's home was necessary for officer safety or the safety "of any other occupants of the house." Under the circumstances presented here, however, the officers had no information that any persons in the house were at risk. CW told Deputy Winterberg that after the Sawvel brothers became belligerent, Defendant shot a gun through the front door. The Sawvels then left the residence and CW went to bed. After she was assaulted by Defendant, CW and her daughter left the house. The officers had no information that Defendant shot the gun *at* anyone, or that he threatened anyone with the weapon. Based on the information

---

[3] *See* Government's Memorandum in Support of Resistance to Defendant's Motion to Suppress at 7 (docket number 23-2 at 7).

CW gave to Winterberg, it was likely that the house was unoccupied, except for Defendant. (Unknown to the officers at that time, Corey Sawvel had returned to the residence after CW left, and Defendant had invited a female friend over.) Similarly, the Government offered no evidence that a warrantless entry into the residence was required for officer safety. Instead, by entering the residence, the officers potentially placed themselves in harm's way. *See United States v. Johnson*, 12 F.3d 760, 764 (8th Cir. 1993) ("The police themselves [] cannot create the exigency."); *Williams*, 521 F.3d at 908 (same).

The cases cited by the Government are easily distinguishable. In *Poe*, the defendant entered a conditional plea of guilty to a charge of being a felon in possession of a firearm, following the district court's denial of his motion to suppress evidence seized during a warrantless search of his home. 462 F.3d at 998. There, officers went to the defendant's residence to investigate a report of a stolen vehicle. Looking through a sliding glass door, an officer saw the defendant and ordered him to open the door. Instead, defendant picked up a 12-gauge shotgun. Eventually, the defendant opened the door, "stood back," and an officer entered the house. *Id.* at 998-99. The Court rejected the government's argument that the defendant's actions "constituted implied consent" to the officer's entry. *Id.* at 1000. Nonetheless, the Court concluded that exigent circumstances justified the officer's warrantless entry into the house.

> When Poe ultimately opened the door and stepped back, [the officer] had been knocking and announcing his presence for over ten minutes. Immediately prior to the door opening, [the officer] heard commotion coming from behind the residence, yelling and static on his radio. [The officer] knew that the static was coming from [a second officer]. He contemporaneously became aware that [a third officer] was running to the front of the house but did not hear what [the third officer] was saying because he was focused on the opening door. [The officer] did not know who was in the home, whether Poe or anybody else was armed, what had transpired behind the duplex to give rise to the sudden commotion or what his colleagues were urgently attempting to

> tell him. Under these circumstances, we find that [the first officer] could have reasonably and legitimately been concerned for his safety as well as the safety of others present at the scene. Therefore, exigent circumstances existed to justify [the first officer's] limited entry into the duplex to handcuff and arrest Poe.

*Id.* at 1001. None of the urgency or potential for harm described in *Poe* existed here.

Similarly, in *Hill*, officers went to the defendant's residence to execute an arrest warrant on charges of aggravated robbery. The defendant was arrested when he exited his residence to place trash on the curb. Officers observed another man standing in the entryway of the residence, look outside the house at the officers, and "then run back into" the residence. 430 F.3d at 940. An officer "pulled open the door to the entryway where Hill's wife was standing and asked her who else was in the house." *Id.* She replied that no one else was there, which the officer knew to be untrue. The officer then "drew his gun and quickly entered the house." *Id.* at 940. The Court concluded that the officer "had a legitimate and reasonable concern for the safety of Hill and the officers present, and therefore exigent circumstances justified the entry of Hill's home." *Id.* at 941. The distinguishing feature in both *Poe* and *Hill* is that a fluid situation required immediate action by the officers.

Exigent circumstances may be found "when there is a compelling need for official action and there is no time to secure a warrant." *Radloff v. City of Oelwein, Iowa*, 380 F.3d 344, 348 (8th Cir. 2004) (citing *Michigan v. Tyler*, 436 U.S. at 509). The First Circuit has described the test as "whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Wihbey*, 75 F.3d 761, 766 (1st Cir. 1996). Here, officers had no information that any lives were being threatened, that a suspect's escape was imminent, or that evidence was about to be destroyed. Clearly, the officers "had time" to secure a warrant to enter the

house, if necessary.[4] In this case, there were no exigent circumstances which required the officers' immediate warrantless entry into the house.

## B. Is the Evidence Admissible Under the Independent Source Doctrine?

Alternatively, the Government argues that even if the initial warrantless entry into the house was not supported by exigent circumstances, and was therefore unlawful, the evidence is nonetheless admissible under the independent source doctrine. Defendant argues that the independent source doctrine is inapplicable.

Generally, the exclusionary rule prohibits the use of evidence obtained during an unlawful search, including evidence acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939). *See also Wong Sun v. United States*, 371 U.S. 471 (1963). There are exceptions to the general rule. The independent source doctrine permits the use of evidence "initially discovered during an unlawful search, but later obtained independently through activities untainted by the illegality." *United States v. Khabeer*, 410 F.3d 477, 483 (8th Cir. 2005). This exception is premised on the belief that

> the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.

*Nix v. Williams*, 467 U.S. 431. 443 (1984).

In *Murray v. United States*, 487 U.S. 533 (1988), the Court addressed the admissibility of evidence obtained during the execution of a search warrant, which followed an earlier unlawful entry onto the premises. The Court concluded that if the

---

[4] While the officers may have believed that they had Corey Sawvel's consent to enter, the Government concedes that Sawvel told the officers that he did not live at the house, and that his consent was not constitutionally adequate. *See United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003). Accordingly, the consent exception to the warrant requirement is inapplicable.

search and acquisition of evidence was not the result of the earlier entry, then "there's no reason why the independent source doctrine should not apply." *Id.* at 541. The Court described the "ultimate question" as

> whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Id.* at 542.

The Eighth Circuit Court of Appeals recently addressed the same issue in *United States v. Swope*, 542 F.3d 609 (8th Cir. 2008). The Court cites the two-part test set forth in *Murray* and rephrased it as follows:

> In other words, *Murray* asks the following two questions, both of which must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them.

*Id.* at 613-14. The Court will address the two questions in turn.

### 1. Would the Officers Have Applied for a Search Warrant Had They Not Acquired Additional Information in the Initial Warrantless Entry?

As set forth in more detail above, Deputy Winterberg was dispatched to the scene following a report of a woman carrying a baby and attempting to flag down a car on a rural blacktop road late at night. Winterberg found CW and her daughter at a neighboring acreage. CW was crying and appeared "shaken up." Her daughter was wearing only pajamas and was wrapped in a blanket. CW described the events of that evening to Winterberg, and reported that Defendant had shot a gun through the front door of the residence. CW also advised Winterberg that Defendant was a convicted felon. According to CW, she left the residence after she was assaulted by Defendant.

14

Deputy Winterberg testified at the instant hearing that he consulted with Butler County Sheriff Jason Johnson after delivering CW and her daughter to friends in Greene. At that point, Winterberg had confirmed that Defendant is a convicted felon. Johnson and Winterberg agreed that Winterberg would go to Defendant's home, together with other officers, and investigate further. According to Winterberg, however, he and Johnson also specifically discussed a course of action if Defendant did not respond to the door or otherwise refused the officers' entry. Winterberg testified that it was agreed that under those circumstances, Winterberg would seek a search warrant.

As it happened, Corey Sawvel responded to the door when officers arrived. With Sawvel's acquiescence, officers entered the house without a warrant and without adequate consent. Defendant emerged from his bedroom and, in response to questioning, admitted that he is a convicted felon and admitted shooting a gun that evening. Defendant was then arrested and *Mirandized*. During this process, Deputy Bass observed "a casing, other bullets and drug paraphernalia (marijuana pipe)" in the living room. Winterberg also observed "long guns strewn about with more ammo lying around" when looking through the doorway into the bedroom.

As set forth in *Murray* and *Swope*, the first question the Court must answer is whether Winterberg would have applied for a search warrant, even without the additional knowledge acquired by the officers' warrantless entry into the house. The Court answers that question in the affirmative. Winterberg had received information from CW that Defendant is a convicted felon and fired a gun out the front door of his residence. CW also reported that she left the house in a hurry after she was assaulted by Defendant. The surrounding circumstances supported a belief by Winterberg that CW was being truthful. She was seen by a passing motorist at 10:24 p.m. on a winter's night walking down a rural blacktop road and attempting to flag down a car. She then appeared at a neighbor's doorstep, daughter in hand, with her daughter wearing only pajamas and a blanket. CW was crying and shaken up. Winterberg subsequently confirmed CW's assertion that Defendant is a convicted felon. Winterberg testified that he discussed a course of action

15

with the sheriff, and they agreed that he would seek a search warrant if no one responded when they went to the property. The Court finds his testimony to be credible.

Accordingly, the Court finds that Deputy Winterberg would have applied for a search warrant even if the officers had not acquired additional confirming information during their initial warrantless entry into Defendant's house. While officers observed firearms and drug paraphernalia in plain view after entering the house, they had previously formed an intention to obtain a search warrant even without that additional information. Therefore, the first prong of the *Murray/Swope* test has been met. *Swope*, 542 F.3d at 615 ("[T]he proper test under *Murray*'s first prong is whether the police would have applied for the warrant had they not made the prior illegal observations.").

### 2.   *Does the Application for the Search Warrant Support Probable Cause After the Tainted Information is Removed?*

The second prong of the *Murray/Swope* test requires the Court to determine "whether removing the tainted information also removes the basis for probable cause." *Swope*, 542 F.3d at 614. The "tainted information" in this case includes references to the drug paraphernalia and firearms observed inside the house, and Defendant's admissions regarding firing a gun that evening and possession of firearms.

When the tainted information is removed, the application is supported by Deputy Winterberg's affidavit describing his interview with CW, information independently obtained by Winterberg, and CW's supporting statement. Winterberg's affidavit states that CW told him that her stepdad was intoxicated, was arguing with his friends, and that he grabbed her mother's pistol and fired it through the front screen door. It also reported that she was assaulted by her stepdad that evening. The affidavit states that CW told Winterberg that her stepfather was a sex offender and is a convicted felon. According to the affidavit, Winterberg ran a criminal history check and confirmed that Defendant was a convicted felon, and the affidavit also states that Defendant is a registered sex offender. CW's supporting statement provides additional detail consistent with Winterberg's affidavit.

The Court believes that Deputy Winterberg's redacted affidavit and CW's attached statement would support a finding of probable cause by the judicial magistrate. That is, even with the tainted information removed, the remaining information would have supported the issuance of a search warrant by the judicial magistrate. CW reported that her stepdad got drunk that evening and shot her mother's pistol. According to her statement, CW "got my daughter and ran to the nearest house" after she was assaulted by her stepdad. CW told Deputy Winterberg that her stepdad was a sex offender and a convicted felon. Winterberg independently confirmed those statements. In addition, the reports from a passing motorist and the neighbor established that CW left the house late at night with her daughter, apparently seeking help. CW's appearance and demeanor when interviewed by Winterberg were also consistent with her story. The judicial magistrate could have concluded that CW was being truthful in her statement and in her description of the events to Winterberg. In addition, particularly given the time of night, it was probable that Defendant and the weapon could be located inside the house. Accordingly, a redacted application would nonetheless support probable cause. *Swope*, 542 F.3d at 616 ("To support probable cause, the redacted application 'must describe circumstances showing that based on practical experience and common sense, there is a fair probability that contraband or similar evidence will be found in the targeted place.'") (quoting *United States v. Nguyen*, 526 F.3d 1129, 1133 (8th Cir. 2003)). Therefore, the Court answers the second question posed by *Murray/Swope* in the affirmative.

Having answered both questions posed by *Murray/Swope* in the affirmative, the Court concludes that the independent source doctrine is applicable to the physical evidence seized by officers during the execution of the search warrant. While the initial entry into Defendant's home was unlawful and enabled them to view contraband in plain view, officers had intended to seek a search warrant even if they had not obtained entry into the house or viewed the contraband. After the officers' observations inside the house are removed from the supporting affidavit, the application for search warrant nonetheless supports a finding of probable cause to search the house for the weapon described by CW.

### C. Are Defendant's Statements Admissible Into Evidence?

In his instant motion to suppress, Defendant asks the Court to suppress "any evidence obtained as a result of the search of his home on November 25, 2008, including any statements obtained from him by law enforcement."[5] However, neither the motion nor the supporting brief specifies the statements to which Defendant refers. The "introduction" portion of the brief simply states that after officers entered the home, "Defendant allegedly admitted shooting his gun out of the screen door earlier in the evening."[6] The "argument" portion of the brief makes no reference to the statements whatsoever.

In the "statement of relevant facts" found in the Government's memorandum in support of its resistance to Defendant's motion to suppress, the Government asserts that Defendant "admitted shooting his gun out the screen door earlier in the evening and stated he shot his gun out the door the day before, too. He admitted he was a felon."[7] In a footnote to its memorandum, the Government suggests that "Defendant does not appear to challenge the admissibility of statements made by him after November 25, 2008," citing specifically a "voluntary statement" made by Defendant at the sheriff's office on the following day.[8] At the time of hearing, however, Defendant made it clear that his motion to suppress "any statements obtained from him by law enforcement" was intended to include the statement given to Sheriff Johnson on November 26, 2008.

---

[5] *See* Motion to Suppress (docket number 16).

[6] *See* Brief in Support of Motion to Suppress at 3 (docket number 16-2 at 3).

[7] *See* Government Memorandum in Support of Resistance to Defendant's Motion to Suppress at 5 (docket number 23-2 at 5).

[8] *See Id.* at 10, n.3 (docket number 23-2 at 10).

## 1. *Statements Made at Defendant's Home*

As set forth above, the Court agrees with Defendant that the officers' initial warrantless entry into the house was not supported by exigent circumstances. The Court has also concluded, however, that the physical evidence subsequently seized pursuant to the state search warrant is admissible by application of the independent source doctrine. The Court must now determine whether statements made by Defendant during the initial unlawful entry are admissible into evidence.

Upon entering Defendant's home, the officers announced their presence by shouting "sheriff's office." Defendant responded from behind the closed bedroom door by asking "Who the f___ is in my house?" When Defendant emerged from the bedroom, he was questioned by Deputy Winterberg. Deputy Winterberg testified as follows about their conversation:

> Q.   At that point did you speak with Mr. Craig?
>
> A.   Yes.
>
> Q.   And what did you talk to him about?
>
> A.   He wanted to know what we were doing in his residence and I told him that we had a report of what happened there earlier that evening and he wondered what that was and I asked if he had any guns in the residence or fired any guns that evening. And he said yeah he's done that before. And I said well which gun did you shoot through the door did you shoot that night and he said well I think it was the Mossberg and I pointed kind of through the bedroom doorway like that one. Well that one or one of them I've got a couple of them.
>
> Q.   Did you ask him about his status as a felon?
>
> A.   Yes.
>
> Q.   What how did he reply?

A.   He said yes that he was a felon.

Q.   At that point what did you do?

A.   We brought him outside.  He was placed in a squad car.

Q.   Was Mr. Craig arrested at that point?

A.   Yes.

Defendant argues that since the initial warrantless entry was not supported by exigent circumstances, any statements made by him during that initial encounter are inadmissible.  In a supplemental brief filed following the hearing, Defendant argues that the officers' "warrantless entry was presumptively unreasonable and all evidence and statements flowing from that entry must be suppressed."[9]  The Government's response to Defendant's argument is unclear.  Citing *Wong Sun*, the Government states in its memorandum as follows:

> Because there was probable cause supporting the warrant
> application without any evidence from inside Defendant's
> home and the search warrant would have been sought,
> regardless, all evidence of firearms violations seized pursuant
> to the warrant and all of defendant's subsequent statements are
> admissible against defendant.

Government Memorandum in Support of Resistance to Defendant's Motion to Suppress at 10 (docket number 23-2 at 10).  It is unclear what the Government considers "subsequent statements."

The Government appears to suggest that *if* the officers had initially entered Defendant's home with a warrant, then it is likely that he would have responded to Deputy Winterberg's questions in the same way; and that since the physical evidence seized pursuant to the search warrant is admissible under the independent source doctrine, the statements made by Defendant prior to obtaining the search warrant are similarly

---

[9] *See* Defendant's Supplemental Brief in Support of Motion to Suppress at 8 (docket number 33 at 8).

admissible. The only authority cited by the Government in support of that proposition is *Wong Sun*, 371 U.S. at 487.

The Court cannot find any support for the Government's argument in *Wong Sun*. There, officers arrested James Toy without a warrant and without probable cause. The Court found that just as "[t]he exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion," the Fourth Amendment also protects statements obtained in the same manner. *Id.* at 485 ("[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion.").

Turning to the facts in the instant action, Defendant's incriminating statements were made immediately following the officers' unlawful entry. Pursuant to *Wong Sun*, they are clearly "fruit of the poisonous tree" and inadmissible, unless they are somehow admissible under the independent source doctrine. *Wong Sun* does not address application of the independent source doctrine to verbal statements. As previously noted, the Government offers no other authority to support its argument in this regard.

The purpose of the independent source doctrine is to draw a balance between deterring unlawful police conduct and the public interest in receiving all probative evidence of a crime. *Nix*, 467 U.S. at 443. When drawing that balance, the United States Supreme Court has concluded that the police should not be put in a *worse* position than they would have been in if no police error or misconduct had occurred. *Murray*, 487 U.S. at 542 ("[W]hile the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied."). Thus, as discussed in more detail above, (1) if the officers would have applied for a search warrant had they not acquired the additional information gained in the initial warrantless entry, and (2) if the application for search warrant would have supported probable cause even after the tainted information was removed, then the tangible evidence seized during the execution of the search warrant is admissible pursuant to the independent source doctrine. The

doctrine does not render admissible, however, evidence obtained during the initial unlawful entry. To hold otherwise would place the police in a *better* position than "if no police error or misconduct had occurred."

Therefore, the Court concludes that verbal statements made by Defendant during the officers' initial unlawful entry are inadmissible under *Wong Sun*, and are not somehow rendered admissible by the independent source doctrine. *If* Defendant had been present when the state search warrant was executed, and *if* Defendant had made similar statements in response to questioning by Deputy Winterberg, then the statements *may* have been admissible under the independent source doctrine.[10] In this case, however, Defendant made the statements during the officers' initial unlawful entry. The Court concludes that Defendant's motion to suppress statements made by him during the initial unlawful entry should be granted.

### 2. Statements Made at the Sheriff's Office

Officers arrested Defendant during the early morning hours of November 25, 2008. He was seen by a judicial magistrate later that morning and released on bond. On the following day, November 26, Defendant voluntarily went to the sheriff's office and asked to speak to Sheriff Johnson. Defendant voluntarily submitted a urine sample, apparently to establish that the marijuana and marijuana pipe found at his home were not used by him. In addition, Defendant asked to speak to Sheriff Johnson in order to give his side of the story.

---

[10] The Court notes parenthetically that Defendant was not *Mirandized* prior to questioning. Presumably, the parties disagree regarding whether this was a custodial interrogation. Generally, a *Miranda* warning is only required prior to a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 477 (1966). While Defendant was not placed under arrest prior to questioning, officers entered his home in the middle of the night with guns drawn. *Miranda* defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Since the issue is not raised by Defendant in his brief, however, the Court will not address it here.

The exclusionary rule prohibits the use of evidence obtained during an unlawful search, including evidence acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint." *Nardone*, 308 U.S. at 341. Even statements made following an illegal arrest are admissible if the "intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (quoting *Brown v. Illinois*, 422 U.S. 590, 602 (1975) (in turn quoting *Wong Sun*, 371 U.S. at 487)).

The statements made by Defendant at his home are clearly distinguishable from the statements made by him at the sheriff's office. On November 25, Defendant was apparently awakened in the middle of the night by officers entering his home with guns drawn. Defendant responded to questions asked by Deputy Winterberg regarding the events of that evening. On November 26, Defendant went to the sheriff's office on his own initiative, during the day, and asked to give his version of events to Sheriff Johnson. Defendant was presumably rested, was under no compulsion to speak, and had more than 24 hours in which to consider his remarks. The Court concludes that unlike the statements made at his home, the statements made by Defendant at the sheriff's office are "so attenuated [from the unlawful entry] as to dissipate the taint."

## VI. CONCLUSION

In summary, the Court concludes that the officers' warrantless entry into Defendant's home during the early morning hours of November 25, 2008 was not supported by exigent circumstances and was, therefore, violative of the Fourth Amendment. As a consequence, any statements made by Defendant during the initial unlawful entry are inadmissible at the time of trial. The Court further concludes, however, that evidence seized pursuant to a state search warrant subsequently obtained by the officers is admissible pursuant to the independent source doctrine. That is, the officers would have applied for a search warrant even if they had not acquired additional information during the initial warrantless entry, and the information available to the

officers prior to the entry would have supported a finding of probable cause. Accordingly, the physical evidence seized during the execution of the state search warrant is admissible. Finally, the Court concludes that statements made by Defendant at the sheriff's office on November 26, 2008 are sufficiently attenuated from the initial unlawful entry as to allow their admissibility into evidence.

## VII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the district court **GRANT** in part and **DENY** in part the Motion to Suppress (docket number 16) filed by Defendant on May 8, 2009 as follows: I recommend that the district court grant Defendant's motion to suppress statements made by Defendant at his home following the officers' entry during the early morning hours of November 25, 2008. I further recommend, however, that the district court deny Defendant's motion to suppress the physical evidence seized during the execution of a subsequent state search warrant, and deny his motion to suppress statements made by Defendant at the sheriff's office on November 26, 2008.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1)(B), that within ten (10) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *Defendant is reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if Defendant is going to object to this Report and Recommendation, he must promptly order a transcript of the hearing held on May 18, 2009.*

DATED this 10th day of June, 2009.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

24